CARMEN BATTALLA, an Infant, by Her Guardian ad Litem CARMEN BATTALLA, Respondent, *v.* STATE OF NEW YORK, Appellant. (Claim No. 35621.)

Third Deparment, July 15, 1966.

*Louis J. Lefkowitz, Attorney-General (Winifred C. Stanley* of counsel), for appellant.

*Leon Segan* for respondent.

HERLIHY, J. The basic facts in this case are not disputed. It appears that the claimant (9 years of age), her aunt and a friend visited the Bellayre Mountain Ski Center, which is owned and operated by the State, on September 2, 1956. While there, they ascended the mountain by use of the State's chair lift, at which time an employee of the State closed a bar and footrest on the chair, which bar had the effect of preventing the claimant from falling out of the chair. After visiting the top of the mountain they descended by the chair lift, but at this time the State's employee did not close the aforesaid bar and footrest. Claimant testified that on the descent in the open chair she became very frightened that she might fall out of the chair.

The State first contends that there was no proof of negligence. This case has previously been to the Court of Appeals (*Battalla* v. *State of New York,* 10 N Y 2d 237, 242) where it was held that the claim stated a cause of action, and the majority opinion concluded " Claimant should, therefore, be given an opportunity to prove that her injuries were proximately caused by defendant's negligence.''

The present record establishes defendant's negligence, claimant's freedom from contributory negligence and such causation.

It has been established in *Grauer* v. *State of New York* (9 A D 2d 829) that the State in the operation of its lift is a common carrier. That case, however, did not consider the question of whether or not the State had a duty to close the bar and footrest.

The principal issue raised by the State is that the hazard of fright sufficient to cause emotional disturbance with physical manifestations was not such a risk as reasonably to be perceived and that the record does not justify such a finding.

In view of the fact that this was an infant, nine years of age, it appears that the court could properly infer that the State should have closed the bar and footrest for the protection of the infant while a passenger in the chair. A sign at the loading area on top of the mountain stated "Close safety bar and footrest", which clearly supports the conclusion that this bar and footrest were considered necessary devices for the trip. The sign is not specifically directed at either the passenger or the attendant, but certainly the State could not assume that an infant would (1) understand the sign and (2) realize that it applied to her.

The relationship of such duty to fright is another question. The fact that someone, and particularly an infant of tender years, might become frightened as a result of being on an open chair, which at points is at least 25 feet from the ground, descending some 3,000 feet down the slope of a mountain is obviously foreseeable. Further, it is common knowledge that fright can have serious mental and physical consequences. (See *Battalla* v. *State of New York, supra,* p. 241.) Accordingly, it appears that fright and detrimental consequences were or should have been anticipated by the State. In view of such foreseeability, the duty to take reasonable precautions, such as closing the safety bar, is properly inferred in regard to the infant passenger and such failure is the proximate cause of the resulting injuries, due to the negligence of the State.

The State next argues that the claimant has failed to prove the alleged injuries.

The claimant testified that upon realizing that the bar was not closed in front of her she "tensed up" and gripped the poles at the side of the chair. Other passengers were looking at her and telling her not to look down and not to be nervous, and she thereupon started crying and closed her eyes for nearly the whole ride. She further testified that thereafter she was very nervous and that night did not sleep well and in fact slept in a lighted room with an adult. The next day she was very nervous and felt that she had a constant blinking of the eyes. Prior to the day of this fright she had slept in her own bed, with the lights off and had not had the blinking of the eyes. About the third day after the fright she began to have headaches some five to six times a week, which she had not had prior to the incident. About four days after the incident she was still sleeping with someone else; had the light left on and woke up often at night after dreaming of the incident. On the fourth day her father suddenly died.

She further testified that after the fright she was nervous about looking out windows and would have to hold on to railings when climbing stairs. The conditions set forth above continued and about six weeks after the incident she went to Dr. Frocht, who was deceased at the time of the trial.

Claimant testified that on July 30, 1959 she was still blinking constantly and her condition remained generally the same. The blinking became less constant about 1961 and the headaches stopped occurring as often at about the same time.

The claimant's mother testified that prior to September 2, 1956 the claimant slept alone in her own bed, with the lights off. After September 2, 1956 she was very nervous and kept blinking, and since that time the claimant has not slept alone and the lights had to be on at night. Prior to the incident the claimant had been on the rides at Coney Island, but afterward she would not go on the rides. She further testified that at the time of trial the claimant still has some blinking of the eyes with headaches; is afraid of heights; sleeps with her mother and needs a light on at night.

The claimant's aunt also observed the nervousness and blinking testified to by claimant and her mother. The aunt further testified that for six months prior to the incident the claimant wore eyeglasses.

The claimant testified that at the present time she has headaches about two or three times a week, accompanied by the blinking. It also appears that in 1961 during the Summertime she did occasionally sleep alone. It further appears that she had headaches and the blinking regardless of whether or not she was wearing glasses.

Dr. Feldman, a neurologist, examined claimant on July 30, 1959, November 13, 1961 and August 27, 1962. He testified that upon his examination in 1959 he found that she had a nearsighted difficulty with her eyes; that there was no physical dysfunction of the nervous system but she had symptoms of a "phobic anxiety state" which he explained is abnormal anxiety in certain situations. He said that in 1959 she complained of being nervous, not liking heights or sleeping by herself. On November 13, 1961 he found her emotional condition to be better controlled. In August of 1962 he found that claimant was recovering but still had some anxiety and phobias. The doctor further testified that the blinking, headaches, fear of sleeping alone and associated complaints were caused by the fright that claimant suffered on the chair lift. This doctor made no inquiry in regard to the death of claimant's father.

Dr. Kaplan next testified for the claimant as a specialist in both neurology and psychiatry. He examined the claimant in October of 1962. The claimant told this doctor that her father had died five days after this incident and that she was upset by his death. This doctor found a " stress reaction " related to the chair lift incident. He further related this condition directly to the chair lift as opposed to her father's death. He said that the symptoms still persisted at the time of his examination. As of the time of trial, most of the symptoms described above had disappeared. He specifically testified that her father's death may have prolonged her symptoms, but the cause was the chair lift incident.

Dr. Barbara Fish testified for the defendant as a child psychiatrist. She examined the claimant on September 19, 1961 for the first time. Dr. Fish found no psychiatric disability at the time of that examination. She found that claimant did suffer fear during the chair lift ride. She further found symptoms related to this fear for the next few days but subsiding prior to the father's death. However, Dr. Fish found that all symptoms after the father's death were attributable to such death and not to the chair lift. She found the same at a subsequent examination in 1962. It appears that Dr. Fish does not deny that the claimant had some physical occurrence after the fright, and that it was a " stressful " experience.

It is to be noted that all of the doctors agree that the claimant suffered no disability in her normal functions as a result of the accident and that she carried out all normal activities with no trouble other than the blinking of the eyes.

Based on the testimony set forth above and the medical opinions of the claimant's doctors, it appears that the trial court properly found that the claimant suffered some injuries as a result of her fear.

It appears, however, that these injuries subsided over a period of time without interfering with claimant's normal activities and are not permanent in nature. The State argues that the award was excessive. The record establishes that the injuries did not prevent the claimant from ordinary activities other than such as might invoke her fear of heights. Her actual medical expenses were the sum of $200 and there is some testimony that a moderate amount of psychiatric treatment might be helpful.

The assessment of monetary damages for injuries suffered from fright is subject to the ordinary rule that the amount awarded must be fair and reasonable and sufficient to compen-

sate for the said injuries. While the symptoms from this type of injury may not require the immediacy of medical treatment that some other form demands, the record nevertheless establishes that the claimant did not consult a doctor until approximately six weeks after the event, during which time there had been an intervening tragedy in her family, and that the said doctor prescribed no treatment or therapy. The sophisticated medical testimony was premised upon a history and examination of the infant three years or more subsequent to the date of the fright and, in our opinion, the amount awarded was excessive.

The judgment should be modified, on the law and the facts, by reducing the amount of the award to $5,000, and, as so modified, affirmed.

GIBSON, P. J., REYNOLDS and TAYLOR, JJ., concur with HERLIHY, J.; AULISI, J., dissents and votes to affirm.

Judgment modified, on the law and the facts, by reducing the amount of the award to $5,000, and, as so modified, affirmed, without costs.