Bellacosa, J.
(dissenting). Because the dismissal of this entire case against the State by the Court of Claims and the Appellate Division is the justifiable result, I respectfully dissent. The synopsis for my vote to affirm is:
• The New York Constitution grants the Legislature the responsibility to define the subject-matter jurisdiction of the Court of Claims;
• Duly considered and enacted statutes expressly pre *198 scribe and implement that power and forbid implied State liability;
The judicial inferential interpretive method is neither supportable nor suitable for the resolution of this preanswer dispute, in which the Court of Appeals promulgates new subject-matter jurisdiction for a court of limited powers and recognizes new remedies and causes of action against the State;
The constitutional tort theory and nomenclature should not be equated and subsumed within conventional tort doctrines, as a route to resolving fundamental subject-matter jurisdiction and sovereign immunity issues, affecting New York’s jurisprudence in and for the Court of Claims.
The following reasoning and documentation of authorities is necessary because of the complex nature of this dispute and the extensive majority explication. The reinstatement of constitutional tort claims in the Court of Claims invests that court with inferred subject-matter jurisdiction, which the Legislature has not seen fit to confer expressly. The means used to find an implied legislative authorization to achieve the end result substitutes for a quintessentially legislative prerogative.
This Court, "[b]y recognizing” what it tries to minimize as a "narrow remedy for violations of sections 11 and 12 of article I of the State Constitution” so as to "provide appropriate protection” under a distinct " 'species of tort liability’ ” (majority opn, at 178, 192), requires the State itself to answer for alleged "official” wrongdoings. The exposure includes the stigma of societal fault and the payment of unknown sums of public funds, not only for this case but also for innumerable others certain to be improvised within its precedential repertoire.
The significant and sharp controversy grows out of a race-based, community wide police sweep, as part of an investigation stemming from a serious crime committed in an upstate college town. As Judge Hanifin stated, however, in his comprehensive and cogent trial court opinion: "This Court [of Claims] cannot expand its jurisdiction based on the emotional content of the issues presented to it” (Brown v State of New York, Ct Cl, Mar. 17, 1994, claim No. 86979, affd 221 AD2d 681). The *199 focus in this Court, too, should remain solely on the statutory construction question posed by this case: whether the State itself may be sued in the New York State Court of Claims for affronts classified as "constitutional torts.”
I conclude that the analysis and result that ultimately tap the deep reservoir of State responsibility are fundamentally flawed as a matter of law and history. No sustainable root and nexus have been sufficiently identified to overcome the twin towers of State protection expressly reflected in the statutorily specified subject-matter jurisdiction of the Court of Claims and limited surrender of sovereign immunity. Instead, a wide web of words within the statutory interpretation method has been used to discern a route to the desired result, while traditional respect for and proper distribution of power between legislative and judicial branches are deflected. On the other hand, though I express a dissenting viewpoint, I also recognize and respect the cogency and reasonableness that is reflected in the decision my colleagues reach in this complicated case.
I. JURISDICTION AND SOVEREIGN IMMUNITY
A.
The first general statutory provision for claims against the State related to the operation of the Erie Canal (L 1817, ch 262). Through many statutory permutations, the modern Court of Claims was constituted in 1915 (L 1915, chs 1, 100). Its essential jurisdiction prescribed that "/z/n no case shall any liability be implied against the state, and no award shall be made on any claim against the state except upon such legal evidence as would establish liability against an individual or corporation in a court of law or equity” (Code Civ Pro § 264 [emphasis added]).
In Smith v State of New York (227 NY 405), this Court held that the State had not waived its sovereign immunity except as expressly surrendered and, thus, preserved the unrelinquished sovereign immunity of the State (id., at 409-410). The operative construction canon is that "[statutes in derogation of the sovereignty of a state must be strictly construed and a waiver of immunity from liability must be clearly expressed. * * * In the absence of a legislative enactment specifically waiving this immunity, the state cannot be subjected to a liability therefor” (Smith v State, supra, at 410 [emphasis added]). The majority now ordains a new canon, using a judicial inference method not to fill a natural or legislative interstice, *200 but to discover a vaguely unexplored universe of extensive tort exposure against the State, triable in a court of limited jurisdiction.
B.
The history of the exclusive legislative authority with respect to the investiture of jurisdiction in the Court of Claims is plainly expressed in New York Constitution, article VI, § 9 (originally added in 1925 as art VI, § 23). It states that "[t]he court shall have jurisdiction to hear and determine claims against the state or by the state against the claimant or between conflicting claimants as the legislature may provide” (NY Const, art VI, § 9 [emphasis added]; see, Court of Claims Act § 9).
Court of Claims Act § 9 (2) precisely lists the subject-matter jurisdiction in words and structure that indicate a careful consideration by the Legislature of the categories and circumscriptions of claims to which the State’s waiver of immunity would also apply. This Court, interpreting the State’s statutory post-Smith waiver of immunity (L 1929, ch 467), noted that "[i]t includes only claims which appear to the judicial mind and conscience to be such as the Legislature may declare * * * the State should satisfy” (Jackson v State of New York, 261 NY 134, 138, rearg denied 261 NY 637 [emphasis added]). The legislative history accompanying recodification of the Court of Claims Act shows no intention, understanding or contemplation to sweep the State’s assumption of liability into uncharted and open waters as are at issue in this case (see, Bill Jacket, L 1939, ch 860, Mem of James Barrett, Presiding Judge of the Ct Cl, at 2; Mem of Senator Feinberg, at 2-3).
Section 9 of the Court of Claims Act provides, "[t]he court shall have jurisdiction * * * 2. To hear and determine a claim of any person, corporation or municipality against the state * * * for the torts of its officers or employees while acting as such officers or employees, providing the claimant complies with the limitations of this article” (id. [emphasis added]). Correspondingly, the State’s waiver of sovereign immunity is contained in section 8 of the Act, which provides: "The state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations” (Court of Claims Act § 8 [emphasis added]). It is the interplay and application of the various constitutional and *201 legislative declarations, with their evident and express limitations that ought to govern this controversy, not speculative attributions of implied and assumed legislative intent.
A core feature of the defendant State’s more nuanced argument, moreover, is not that the word "tort” is frozen like a fossil in time as of the original enactment of Court of Claims’ jurisdiction. That is a strawman argument posed to overcome the cogent State position on virtually all points and authorities. Indeed, the focus in this statutory construction exercise should remain fixed on the proposition that the term "tort,” for these jurisdictional purposes, pertains only to those claims reasonably understood by the enactors, as part of the common-law tradition, developed within the tort root rubric and jurisprudence (see, e.g., Bovsun v Sanperi, 61 NY2d 219; Battalla v State of New York, 24 NY2d 980, affg 26 AD2d 203). The State’s argument should prevail by a reasonable interpretation of the governing statute, the history of its enactment, and this Court’s restrained interpretation of it and its own powers in this regard. A transformative redefinition and expansion into a fundamentally different juridical genre gives the holding of the instant case breadth-taking dimensions. Moreover, that approach ignores the well-established discipline that subject-matter jurisdiction, groundbreaking new remedies and their policy and practical ramifications, are matters appropriately within the legislative purview and, thus, not within some generalized supervisory or inferential adjudicative role of the courts (see generally, Gershman, Supervisory Power of the New York Courts, 14 Pace L Rev 41 [1994]).
This Court, following the general canon that any waiver of immunity by the State is to be narrowly construed, has further *202 noted that the waiver of immunity ( 8) and grant of jurisdiction ( 9) are not absolute and open-ended (Weiss v Fote, 7 NY2d 579, 585-587). Relevant and analogous precedents illustratively point out that the "State waived that immunity which it had enjoyed solely by reason of its sovereign character,” but that "the State retained its immunity for those governmental actions requiring expert judgment or the exercise of discretion” (Arteaga v State of New York, 72 NY2d 212, 215-216; see, Tarter v State of New York, 68 NY2d 511, 518-519).
*201 The plaintiffs’ predicate argument is that the Legislature, through its use of the word "torts,” implied an all-encompassing corral of wrongs. For starters and contrary to this theory, traditional tort law is not an undefinable, limitless arena of wrongs. Rather, the word of art reflects "[t]he civil action for a tort * * * is commenced and maintained by the injured person, and its primary purpose is to compensate for the damage suffered, at the expense of the wrongdoer” (Prosser and Keeton, Torts § 2, at 7 [5th ed]). Professor Prosser also notes the realistic and sensible limitation that "[i]t does not lie within the power of any judicial system to remedy all human wrongs” (Prosser, op. cit., § 4, at 23). Indeed, the word "tort,” for subject-matter jurisdictional purposes, should be viewed and determined discretely within that universe and context.
*202 Significantly, in Sharapata v Town of Islip (56 NY2d 332), this Court emphasized that it "is hard to believe that any attempt to include punitive damages [in Court of Claims Act § 8] would not have induced lively legislative debate, contemporary State history preceding the formulation of section 8 gives no indication that the matter ever evoked any legislative interest” (id., at 337 [emphasis added]). The Court stated that:
"[T]he twin justifications for punitive damages— punishment and deterrence — are hardly advanced when applied to a governmental unit. As [then] Justice Titone realistically put it in his opinion below, it would be anomalous to have 'the persons who bear the burden of punishment, i.e., the taxpayers and citizens,’ constitute 'the self-same group who are expected to benefit from the public example which the granting of such damages supposedly makes of the wrongdoer’ ” (Sharapata v Town of Islip, supra, 56 NY2d, at 338-339, affg 82 AD2d 350).
The holding of the instant case disregards the usefulness garnered from the parallel purposes and pertinent guidance reflected in the analysis of the punitive damages issue in respect to the constitutional tort "species” (majority opn, at 178, 192).
In Steitz v City of Beacon (295 NY 51), this Court, in interpreting the application of Court of Claims Act § 8 to municipalities, noted that "[a]n intention to impose upon the city the crushing burden of such [liability] should not be imputed to the Legislature in the absence of language clearly designed to have that effect” (id., at 55 [emphasis added]). Yet, that is precisely what the stretched and attenuated analysis does in the instant case (see, Weiss v Fote, 7 NY2d 579, 586-587, supra). It is, after all, the unique governmental police power that is involved here, not some ordinary form of individual or *203 corporate tortious act. For that reason, among others, the claims asserted in this case are nowhere near "sufficiently similar” (majority opn, at 183) to traditionally recognized individual or corporate tort conduct, the limiting and qualifying phrase of the statute itself.
The refined interpretation previously accorded to the State’s waiver of immunity is also reflected in the handling of torts involving members of the State militia. In Goldstein v State of New York (281 NY 396), the Court noted that "if the word 'officers’ is given its broad meaning it would include every officer engaged in performing a duty placed upon him by law, including the Governor, judges, members of the Legislature and all others occupying an official position in the State. Such an interpretation of the statute would lead to an absurd conclusion” (id., at 405 [emphasis added]). The claim was dismissed because the State militia were not within the meaning of the State’s waiver of sovereign immunity (id., at 406; see also, Newiadony v State of New York, 276 App Div 59). In 1953, the Legislature amended the Court of Claims Act (L 1953, ch 343) adding section 8-a by which the State waived its immunity for such torts. Notably, the Legislature — not the courts — expressly expanded this jurisdictional reach into that category, as it also did after Smith (see, Jackson v State of New York, 261 NY 134, 138, supra). The Legislature does not leave these substantial definitional duties and demarcations to chance, implication, the fertile inferential method or to other entities, because definiteness and distribution of powers are important societal and jurisprudential values. It knows well how to be very plain about such matters in fulfilling its up-to-now distinctive responsibility.
The Legislature has never contemplated the common-law word "tort” to include the kind of extensive constitutional domain advanced here because, not only did it not exist until recently, but also had the notion occurred or been presented to that legislative body, the policy debates would surely and necessarily have been "lively” indeed (Sharapata v Town of Islip, 56 NY2d 332, 337, supra). When the Legislature enacted section 12 (1) of the Court of Claims Act — "In no case shall any liability be implied against the state” (emphasis added) — it could not have contemplated this kind of substantial judicial exertion, promulgating new substantive remedies.
*204 II. CONSTITUTIONAL TORTS
A.
The coined term "constitutional tort” is used generally to refer to civil damage actions initiated under 42 USC § 1983. In Monroe v Pape (365 US 167), claimants whose Federal rights were infringed by acts of police officers were allowed to sue individual officers. They could not sue the municipal employer because Congress did not intend municipalities to be "persons” under 42 USC § 1983 (id., at 187, 191). (I agree, by the way, that the 42 USC § 1981 claims remain properly dismissed, but for the more fundamental reason of lack of subject-matter jurisdiction.) The Court in Monroe never expressly or impliedly recognized new species of claims embraced in the classification or common-law history of tort, especially for purposes like local subject-matter jurisdiction.
The origin of the sobriquet "constitutional tort,” which so overridingly drives the analysis of the instant case, is found in the title of a law review article that sets forth to "analyze the jurisprudential development of a federal statutory remedy” (Shapo, Constitutional Tort: Monroe v. Pape, and the Frontiers Beyond, 60 Nw U L Rev 277, 323-324 [1965] [emphasis added]; see, Burnham, Separating Constitutional and Common-Law Torts: A Critique and a Proposed Constitutional Theory of Duty, 73 Minn L Rev 515, n 2 [1989]). Substance and the essence of the claims ought to control, however, not catchy nomenclature for law review titles, later conveniently utilized as semantical shorthand. Chief Judge Fuld, in Morrison v National Broadcasting Co. (19 NY2d 453, revg 24 AD2d 284), in a related context, quoting a well-established rubric, stated: " 'We look for the reality, and the essence of the action and not its mere name’ ” (id., at 459, quoting Brick v Cohn-Hall-Marx Co., 276 NY 259, 264).
The proposition that "constitutional torts” are equivalent to or derive their essential nature from any common-law tort antecedent, worthy of present-day Court of Claims cognizance without legislative authorization, finds no support anywhere. Quite the contrary, in describing a "constitutional tort,” Professor Shapo states "[i]t is not quite a private tort, yet contains tort elements; it is not 'constitutional law,’ but employs a constitutional test. Because of this interesting amalgam, serious questions arise about the measurement of the substantive right” (Shapo, op. cit., at 324). Indeed, the wordsmith himself warns that the "judiciary should tread warily in utilizing a *205 civil damage remedy against local law enforcement officers [I now add a fortiori, against the State itself], where much that is vital to the case grows uniquely from the local situation” (Shapo, op. cit., at 325). Serious confusion is sown from intermingling distinct doctrinal sources, as is evident in the spiral of this case, which has no Federal statutory source and no equivalent or corresponding State statutory enabling predicate.
In Monell v New York City Dept. of Social Servs. (436 US 658), when the Supreme Court overruled Monroe and declared that municipalities could be liable under 42 USC § 1983, it added that "a municipality cannot be held liable solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory” (Monell v New York City Dept. of Social Servs., supra, at 691 [emphasis added]). This key analytical link is rejected by the majority.
Finding accountability for the first time within this uniquely governmental police power context, against the express admonitions of Monell and by the classification of such acts as within this State’s surrender of sovereign immunity, fails to credit and respect this important historical and precedential limitation. Ironically, now the effect of the State’s limited waiver of liability in Court of Claims Act § 8 makes "the State and its subdivisions liable, under the doctrine of respondeat superior, for the negligent acts of its paid employees” in pure constitutional police power circumstances, never contemplated, debated or legislatively enacted (Becker v City of New York, 2 NY2d 226, 235; see also, Welch v State of New York, 203 AD2d 80, 81). Since that is not what the State statutorily surrendered, the upending of this key limitation by something interpretively elevated and recognized as constitutional tort actions against the State and swept into the Court of Claims’ limited charter is severely unsettling (see, Prosser, op. cit., § 69, at 500).
This Court has emphasized, " '[t]he municipal corporation is different. It is not organized for any purpose of gain or profit, but it is a legal creation engaged in carrying on government and administering its details for the general good and as a matter of public necessity’ ” (Sharapata v Town of Islip, 56 NY2d 332, 337, supra, quoting Costich v City of Rochester, 68 App Div 623, 631). Under the majority’s holding, the State may well be deprived of traditional defenses, although those would be available to a government defendant in a Federal constitu *206 tional rights-statutory source case (see, Collins v Harker Hgts., 503 US 115, 121-122; Monell v New York City Dept. of Social Servs., 436 US 658, 691, supra). Indeed, most of the rules limiting tort responsibility — to which the State’s waiver of sovereign immunity and immunity-like protections would otherwise apply — are rendered inoperative and impotent when claims trace their origins to the superior ordinances of constitutional dimension, without any specific statutory enablement or qualifying features.
The United States Supreme Court itself — with apt instruction concerning the instant question — has noted differences between "constitutional torts” and common-law torts (see, Paul v Davis, 424 US 693, 701 [refused to make Due Process Clause "a font of tort law” and noted the "constitutional shoals” confronting any attempt to derive a body of tort law from Federal civil rights statutes (emphasis added)]; Carey v Piphus, 435 US 247, 258-259; Daniels v Williams, 474 US 327, 332; Farmer v Brennan, 511 US 825, 837-838). In analyzing constitutional tort violations the Supreme Court has "emphasize[d] the separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred” (Collins v Harker Hgts., 503 US 115, 122, supra). That some of these notions spring from federalism restraints is not my point; the flat refusal of the majority to heed homegrown constraints, well-established and tested within the historical development and this State’s own constitutional, jurisprudential and statutory disciplines, is the point of my departure and puzzlement (majority opn, at 195).
Further, in "constitutional tort” exertions, claimants are not required to satisfy other thresholds limiting municipal liability, like the "special duty rule” applicable to "ordinary” common-law tort actions against governments. In this respect, this Court has held and cautioned that:
"Absent this requirement, a municipality would be exposed to liability every time one of its citizens was victimized by crime and the municipality failed to take appropriate action although notified of the incident — so vast an expansion of the duty of protection should not emanate from the judicial branch. 'Before such extension of responsibilities should be dictated by the indirect imposition of tort liabilities, there should be a legislative determination that that should be the scope of public respon *207 sibility’ ” (Kircher v City of Jamestown, 74 NY2d 251, 259, quoting Riss v City of New York, 22 NY2d 579, 582; see, Miller v State of New York, 62 NY2d 506; Merced v City of New York, 75 NY2d 798; see also, Schuster v City of New York, 5 NY2d 75).
For these additional reasons, the Federal statutory "constitutional tort” concept should not be merged and subsumed within the meaning of "tort,” as specifically delineated by Court of Claims Act § 8 — unless other appropriate protections for the State are somehow balanced into the equation. This is not done, additionally fortifying the wisdom of keeping the nuanced weighing within the legislative ambit.
No intimation appears anywhere that the Legislature ever thought of, no less enabled or implemented, this new overflowing "font” of State tort liability (see, Paul v Davis, 424 US 693, 701, supra). To infer that it did fundamentally disregards differences of kind and essence, not just degree. The comprehensive treatment and redefinition of the word "tort” in New York for jurisdictional purposes transforms the distinctive and unique qualities, nature, source, purpose and history between conventional torts and constitutional torts.
B.
Plaintiffs are also successful in achieving a result that declares "constitutional torts” as within the class of claims to which the State has surrendered its immunity in the Court of Claims. This conclusion is seriously questionable, as this Court has never before conflated a constitutional duty into such a pervasive and comprehensive tort theory for damages, energized by sheer inference. Notably, claimants are not asking for or receiving some equivalent remedy existing and recognized elsewhere, as the prayer for relief is generously characterized (majority opn, at 179). This relief, as acknowledged throughout the majority opinion, is an additionally recognized remedy, despite forthright acknowledgments of express and analytical limitations. Moreover, it is a remedy in New York only and against the State of New York alone.
I do not doubt for a moment that the Court of Claims possesses jurisdiction over "constitutional tort” type claims when they share a recognized common-law lineage or specifically authorized root such as assault, false arrest, trespass, malicious prosecution and many more (Bovsun v Sanperi, 61 NY2d 219, supra; Battalla v State of New York, 24 NY2d 980, supra). Thus, "[b]y virtue of its waiver of [sovereign] immunity, the State of *208 New York has provided a means by which the citizen can obtain satisfaction in such cases and, at the same time, has afforded protection to itself from unjustified claims based on groundless accusations” (McNamara, Jr., The Court of Claims: Its Development and Present Role in the Unified Court System, 40 St John’s L Rev 1, 40 [1965]).
In this respect, however, the reliance on People v Defore (242 NY 13, cert denied 270 US 657) for the proposition that this Court in the early part of this century recognized a private damages action for search and seizure against the State is as curious in its application to this case as it is disturbing for its wider implications (see, Pitler, Independent State Search and Seizure Constitutionalism: The New York State Court of Appeals’ Quest for Principled Decisionmaking, 62 Brook L Rev 1, seriatim, and at 13-14, 86-97, 152-185 [1996]). In Defore, this Court rejected suppression of illegally acquired evidence as an inappropriate remedy (People v Defore, supra, at 25, 28). Judge Cardozo commented that direct remedies were available to a person subjected to an illegal search, stating that ”[t]he officer might have been resisted, or sued for damages, or even prosecuted for oppression” (id., at 19 [emphasis added]). The majority in the instant case treats Judge Cardozo’s dictum about a private right of action as if it applied against the State — indeed such an assumption is also attributed to the 1938 Constitutional delegates. This mischaracterization is registered frequently in the majority opinion and is reflected in numerous citations that also do not support the enlarged proposition for which they are advanced.
The delegates to the 1938 Constitutional Convention, in considering proposals to adopt the Federal exclusionary rule, appreciated that the civil damages remedy, merely theoretically posed in Defore, was available only against the offending officer {see, Statement by Harold Riegelman, 1 Rev Record of NY Constitutional Convention, 1938, at 416 ["The State forbids an unreasonable search. The State officer disobeys the injunction. He can and should be punished and made to answer in damages” (emphasis added)]; see also, Pitler, op. cit., at 94). These authorities demonstrate that absolutely no basis whatsoever is presented for even a tenuous speculation that Judge Cardozo or the 1938 Constitutional delegates ever imagined a direct action against the State itself for money damages resulting solely from constitutional provisions deemed self-executing.
The same Constitutional Convention, relied upon now to infer a direct action damage remedy against the State, *209 expressly rejected — after sharp and lively debate — not only an exclusionary remedy, but also a forfeiture of office remedy (1 Rev Record of NY Constitutional Convention, 1938, at 578). These express rejections were not done because of the hypothetical dictum of Judge Cardozo concerning a personal civil action, but for fundamental, doctrinal and jurisprudential reasons that were fully debated (see, Statement of Harry E. Lewis, Chairman, Bill of Rights Comm, 1 Rev Record of NY Constitutional Convention, 1938, at 577-578 [opposed office forfeiture amendment to Search and Seizure Clause because it "is necessarily legislative”]). This history and specificity prove, it seems to me, that the civil remedy announced today was never on any delegate’s or legislator’s mind or list, nor should it be assumed to have been (see, Pitler, op. cit., at 157). The gap between express rejection of considered remedies and the discovery of this new additional one is not bridgeable by statutory construction. The subject-matter jurisdiction and cause of action, now simply inferred, results after forthright judicial debate, but in the entirely wrong deliberative forum.
The shock to legislators and delegates would be all the more profound in the modern light of the unquestionable acceptance of the exclusionary rule. It does not take much imagination to conjure up the operational impact of all filings of motions to suppress being accompanied by notices of claims. This prospect would surely have been "foreign” to legislators and delegates, and the practical and procedural ramifications would have concerned them, to put it mildly, that every grant of suppression — as one example only — carried the potential of a virtually certain civil filing and of monetary recovery in the Court of Claims against the State.
Moreover, if such a vein of tort exposure were to be carefully explored through the full labyrinth of the New York Constitution, some would surely and legitimately also raise questions of judicial impact and resources, weighed against the proportionate societal benefit to be obtained (see, Pitler, op. cit., at 54 ["To Cardozo, the far-reaching consequence of the exclusionary rule — that it would free some of the most serious criminal offenders — was simply too high a price to pay, at least until the Legislature spoke with a clearer voice” [emphasis added]). This case engenders a different price where, again, the Legislature has not expressed, implied or spoken in a clear voice.
The reflections and debate on that feature alone, in the customary legislative fashion, would provoke a reality check on the policy implications of seeding new tort clouds so gener *210 ously (see, Eisenberg and Schwab, The Reality of Constitutional Tort Litigation, 72 Cornell L Rev 641, 694 [1987]; Rosen, The Bivens Constitutional Tort: An Unfulfilled Promise, 67 NC L Rev 337, 343 [1989]). If this portentous decision were considered and made by the Legislature — as I believe it should be — the judicial impact and resources questions would engender not only serious, respectful debate, but also robust differences of views and particularized, qualified expressions of law, effected through the statutory enactment method, not the inferential, adjudicative interpretive model.
C.
The plaintiffs alternatively argue for an implied private right of action against the State based on violations of article I, §§ 11 and 12 of the New York State Constitution. Heavy reliance is placed upon Bivens v Six Unknown Fed. Narcotics Agents (403 US 388). Bivens held that an individual government agent or officer could be held liable in Federal court for monetary damages as a result of a violation of the Fourth Amendment to the United States Constitution (id., at 397). Whether the government was liable under an implied right of action based on the violation of a constitutional right, however, was not confronted.
That question was presented to the Court in Federal Deposit Ins. Corp. v Meyer (510 US 471). The Supreme Court stated that it "implied a cause of action against federal officials in Bivens in part because a direct action against the Government was not available” (id., at 485 [emphasis added]). The Court noted that "the purpose of Bivens is to deter the officer. * * * If we were to imply a damages action directly against federal agencies, thereby permitting claimants to bypass qualified immunity, there would be no reason for aggrieved parties to bring damages actions against individual officers” (id., at 485). Finally, the Supreme Court instructively noted that: *211 Using Bivens as a source of authority for what is wrought by the instant holding, yet ignoring its critical limitations as reflected in Federal Deposit Ins. Corp. v Meyer {supra), sidesteps the New York question. The Supreme Court’s deference to Congress to fix some boundaries of government liability and .fiscal accountability closely parallels this Court’s consistent respect for the Legislature’s prerogatives in these matters under explicit direction from this State’s Constitution. New York now reverses its own prudent history, bucks the Federal trend and even discards the useful guiding lights of many sibling States (see, e.g., Figueroa v State of Hawaii, 61 Haw 369, 382, 604 P2d 1198, 1205-1206; Hunter v City of Eugene, 309 Ore 298, 302-303, 787 P2d 881, 883-884).
*210 "Here, unlike in Bivens, there are 'special factors counselling hesitation’ in the creation of a damages remedy. Bivens, 403 U.S., at 396. If we were to recognize a direct action for damages against federal agencies, we would be creating a potentially enormous financial burden for the Federal Government. * * * [Decisions involving '"federal fiscal policy” ’ are not ours to make [citation omitted]. We leave it to Congress to weigh the implications of such a significant expansion of Government liability” (id., at 486 [emphasis added]).
*211 Assuming that there was any justification — and none has been persuasively shown — for this Court to combine a transmuted Bivens analysis and the Restatement (Second) of Torts as a joint sourcing for this groundbreaking decision, such an approach should nevertheless be rejected as unnecessary as well as unauthorized. The New York Legislature and the courts of this State already provide effective and adequate remedies for infringements of constitutional rights. Although the range and reach of some of these remedies may be debatable, the policy choices and degree features are not appropriate justification for this Court’s magnification of the subject-matter jurisdiction of the Court of Claims — a constitutionally delegated legislative power. Indeed, the suggestion that absent this added judicial remedy against the State some amorphous kind of immunity attaches to the underlying conduct is a chimera; claims in this very controversy remain pending against potentially responsible individuals in appropriate general jurisdiction forums, like State Supreme Court and the Federal courts (see, Brown v City of Oneonta, 916 F Supp 176, 911 F Supp 580, 160 FRD 18).
Given the breadth of the Legislature’s specific enactments providing mechanisms to enforce constitutionally guaranteed rights, including the Civil Rights Law {see, e.g., Civil Rights Law § 40-c; Executive Law § 290 et seq.), a judicially created Bivens remedy against the State in the Court of Claims is a significant policy overreach. Indeed, the specificity of remedial legislative enactments and enablements, under standard statutory construction principles, punctuates the argument for some reasonable restraint against the carte blanche invitation inscribed by today’s bold precedent.
As a further example, the Human Rights Law regime is rendered substantially unnecessary and the unanimous ratio *212 nale underlying Koerner v State of New York (62 NY2d 442, 449) is simultaneously made superfluous. If this particular Human Rights Law provision is no barrier to the wider adjudicative interpretive web, then neither are other New York State constitutional provisions under the extended self-executing principle (compare, Pitler, op. cit., at 49-54 [analysis of Civil Rights Law history]).
The plaintiffs assert that the Equal Protection and Search and Seizure Clauses of the State Constitution, though essentially "self-executing,” require no specific legislative enablement to energize the Court of Claims remedy and empowerment they now obtain for themselves as a class and for others precedentially. While "it is now presumed that constitutional provisions are self-executing” (People v Carroll, 3 NY2d 686, 691), no precedent from this Court suggests that a private damages remedy may be inferred and promulgated in the loose and unlimited fashion spread under this large and general umbrella.
Inferring subject-matter jurisdiction, in any event, is a far reach even from recognizing a new cause of action, itself no small matter. One would expect strict and rigorous standards to justify inferring — i.e., attributing to the authorized policymaker, the Legislature — first, a whole new subject-matter jurisdiction for a limited specialized court, and, second, a whole new category of tort liability (not just a duty element). One searches in vain for rigorous analysis and reliable sources justifying such dual, high hurdle attribution (compare, Matter of Tap Elec. Contr. Serv. v Hartnett, 76 NY2d 164, 169 ["courts are reluctant to infer preemption * * * in the absence of an express indication * * * of an intent to do so”], citing Hillsborough County v Automated Med. Labs., 471 US 707, 717-718).
Just as importantly, the judicial rationalization of a need to declare an additional private damages remedy against the State itself, derived from the State Constitution and several other more attenuated and elliptical sources, does not equate to and certainly does not warrant the conferral of subject-matter jurisdiction over such a claim in a court of limited, special powers. The State Constitution itself in article VI, § 9 gives the Legislature the sole authority to determine the monetary claims that may be brought and adjudicated against the State. The cause of action that the majority concedes it needs to "imply” in order to give it life — because it surely is not legislatively expressed — should not prevail over an explicit constitutional imperative and specifically delegated authoriza *213 tion to the Legislature. In any event, such a cause of action should not generally be inferred absent clear, pertinent and unequivocal evidence of the drafters’ intent (see, CPC Intl. v McKesson Corp., 70 NY2d 268, 276-277). There is none such in this case.
Whatever the history of the unreasonable search and seizure protection inspires for the long reach of this case, nothing — not one iota of data — can be identified to support a corresponding constitutional tort grounded in the Equal Protection Clause. This prong of the holding concededly represents the farthest extension of all, with extraordinary precedential implications for a host of constitutional claims reduced to torts that may now enter the wells and dockets of Court of Claims courthouses.
In sum, the lower courts correctly held that the Legislature did not invest the Court of Claims with subject-matter jurisdiction and that the State has not consented to stand accountable in that court for alleged violations by its officers and employees of these constitutional police power exertions. This result and rationale should be upheld whether the claims are the egregious type as alleged to have occurred here or the myriad variety of others interspersed throughout the New York State Constitution. Thus, I vote to affirm the order of the Appellate Division in its entirety.
Chief Judge Kaye and Judges Titone, Smith and Ciparick concur with Judge Simons; Judge Bellacosa dissents in part and votes to affirm in a separate opinion; Judge Levine taking no part.
Order modified, etc.